UNITED STATES *v.* KOONS, WILSON & Co. (No. 1142).[1]

PARATINE OIL WITH LESS THAN 50 PER CENT OF CASTOR OIL.

From the testimony the analysis made by the chemist employed by the appellees must be assumed correct; and there is no proof to the effect that castor oil may have been used in the manufacture of the alizarin assistant which would not be revealed by the analysis. As the oil contained less than 50 per cent of castor oil, it was dutiable under paragraph 32, tariff act of 1909.

United States Court of Customs Appeals, November 11, 1913.

APPEAL from Board of United States General Appraisers, Abstract 31810 (T. D. 33304).

[Affirmed.]

*William L. Wemple,* Assistant Attorney General (*Charles E. McNabb,* assistant attorney, of counsel; *Charles D. Lawrence,* special attorney, on the brief), for the United States.

*Comstock & Washburn* (*J. Stuart Tompkins* on the brief) for appellees.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

SMITH, Judge, delivered the opinion of the court:

Paratine oil, the merchandise which is the subject of this appeal, was returned to the collector of customs at the port of Philadelphia as an alizarin assistant containing more than 50 per cent of castor oil. The importation was therefore assessed for duty at 30 cents per gallon under that part of paragraph 32 of the tariff act of 1909 which reads as follows:

32. Alizarin assistant, sulpho-ricinoleic acid, and ricinoleic acid, and soaps containing castor oil, any of the foregoing in whatever form, in the manufacture of which fifty per centum or more ·of castor oil is used, thirty cents per gallon; * * *.

The importers protested against the collector's assessment on various grounds, but that on which they really relied was the claim that the merchandise was an alizarin assistant containing *less* than 50 per cent of castor oil, and therefore dutiable at 15 cents per gallon under that part of paragraph 32 which reads as follows:

32. Alizarin assistant, sulpho-ricinoleic acid, and ricinoleic acid, and soaps containing castor oil, any of the foregoing in whatever form, * * * in the manufacture of which less than fifty per centum of castor oil is used, fifteen cents per gallon; * * *.

The Board of General Appraisers sustained the protest and the Government appealed.

To overcome the presumption of correctness attaching to the collector's decision the importers at the hearing before the board produced evidence which showed that within two days after arrival of the goods a sample was drawn by William Blattau from barrel

_____

[1] Reported in T. D. 33877 (25 Treas. Dec., 445).

9731, one-half of which sample was submitted by Blattau personally to Elmer C. Bertolet for analysis. It appears from the record that Mr. Bertolet is a graduate in chemistry, practicing his profession and engaged as instructor in chemistry and dyeing at the Philadelphia Textile School. Mr. Bertolet testified that he divided the sample received by him from Blattau into two parts, which were subjected to three tests by Lane's method and found to contain from 78 to 80 per cent of fats, of which percentage from 52 to 53 per cent was unsaponifiable mineral oil, probably petroleum, and therefore not castor oil. Bertolet positively declared that the sample analyzed could not possibly contain more than 30 per cent of castor oil and probably not much more than 16 per cent, allowing about 10 per cent for oleic acid and other saponifiable matter. With his testimony Mr. Bertolet submitted a full report of the analyses made by him of both parts of the sample brought to him by Blattau and of the process which he pursued in reaching his conclusions. This report was offered and received in evidence without objection.

To meet this evidence the Government presented the testimony of Louis B. McSorley, chemist in charge at the port of Philadelphia, and the reports of two chemists, one stationed in the appraiser's office in Boston and the other in the appraiser's office in New York. McSorley testified that samples of oil were submitted to him by the Government examiner, S. W. Minnich, and that he examined them by Lane's method for the purpose of determining the percentage of castor oil which they contained. As a result of his analysis and investigation McSorley found that the samples submitted to him contained 8.83 per cent of unsaponifiable mineral oil, from 10 to 15 per cent of vegetable oil which was not castor oil, and from 59 to about 60 per cent of castor oil. This analysis was substantially confirmed by the analysis made by the chemist in the appraiser's office at New York and by the chemist in the appraiser's office at Boston. The analyses made by the Government chemists were completely at variance with the analyses made by Bertolet, and if they had been connected with the importation we should be very much inclined to hold that the Government had established by a preponderance of evidence that the merchandise was of the character found by the collector. Unfortunately for any such holding, however, the Government failed to prove that the samples analyzed by McSorley and by the chemists in the appraisers' offices at New York and Boston were samples of the merchandise imported.

As already stated, McSorley testified that he analyzed samples of oil which were submitted to him by the Government examiner, Mr. Minnich, and his official report, which was not under oath, recites that he analyzed paratine oil marked Ⓑ, packages numbered 9730

to 9734, covered by entry 27018, but makes no mention of the five packages numbered 6733 to 6737 included in the same entry and referred to specifically in the protest. In the testimony which Mr. McSorley was called upon to give, however, he did not say that the samples examined by him came to him marked as indicated in his report and declined to say that they were taken from the merchandise imported or that they were official samples of the goods to which the importers' protest was directed. Mr. Minnich, on his part, testified at the hearing before the board that he took or caused to be taken samples of *both* of the oils covered by the importation and sent them to the chemist, but said nothing as to the barrels from which the samples were taken, nothing as to marking them for identification, and nothing as to what he meant by samples of *both* oils. Mr. Minnich frankly admitted that he could not identify the official samples as the samples taken by him from the goods imported, neither did he pretend to say that the samples which were analyzed by McSorley were the samples which he had sent. As the testimony stands, therefore, McSorley is able to say that he made an analysis of samples sent to him by Minnich, but he can not say from what barrels or even from what importation the samples came. On the other hand, Minnich is able to say that he took samples of *both* oils imported, but can not say whether either or both of those were analyzed by McSorley and much less that they were the samples to which McSorley directed his testimony on the hearing before the board. Of course, proof that Minnich sent samples of paratine oil but once to McSorley and that McSorley analyzed but one set of samples received from Minnich might be accepted as some evidence tending to show that the samples analyzed were part of the importation. No such proof, however, was made, and considering that the percentage of castor oil in every importation of alizarin assistant must be determined by analysis in order to determine the correct rate of duty, we can not assume that samples of alizarin assistant were sent but once by the Government examiner for analysis or that the Government chemist analyzed but once samples of alizarin assistant, especially as in this case it appears from the invoice that in addition to the packages of oil numbered 9730 to 9734 there were five other packages numbered 6733 to 6737 which were covered by the same entry and invoice and of which the report of the Government chemist makes no mention at all. The samples analyzed by the chemists at Boston and New York were no better connected with the importation than were the samples analyzed by McSorley.

We find nothing in the record which would justify us in concluding that Mr. Bertolet was not a qualified and capable chemist. He

made his analyses by Lane's method. just as did McSorley. He submitted in writing the various steps which he took in making the analyses and the process and facts on which he based his conclusion that the importation could not contain more than 30 per cent of castor oil. If he made any mistake either in his figures or in the process which he pursued it seems to us that that fact would have been made manifest by his detailed report and that it could have been readily pointed out by McSorley or any other capable chemist. No attempt was made to question the report directly, and as it stands uncontradicted by any evidence other than that of analyses of samples not shown to have been taken from the importation, we think we are justified in assuming that it was correct.

The suggestion that castor oil may have been used in the manufacture of the alizarin assistant which would not be revealed by a chemical analysis is not sustained by any proof to that effect, and in the absence of any evidence showing that some of the castor oil was lost by chemical reaction or otherwise we must presume that the amount actually found was the amount actually used in the manufacture of the assistant.

The decision of the Board of General Appraisers is *affirmed.*